**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

**DANIEL NEIL JACKSON,**

       **Plaintiff,**

**v.**

                              **Case No.: 7:22-cv-00090**

**D. DAMERON, et al.**

       **Defendants.**

## KYLE SMITH, MD AND DERINDA DAMERON, RN'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

COME NOW, Kyle Smith, MD (identified in the Complaint as "Dr. K. Smith", hereinafter "Dr. Smith") and Derinda Dameron, RN (identified in the Complaint as "D. Dameron, RN", hereinafter, "Nurse Dameron"), (jointly, "the Defendants"), by counsel, and pursuant to Rule 56, of the Federal Rules of Civil Procedure as well as Local Rules 56 and 11(c), respectfully move this Court to dismiss all claims against them[1]. In support of their Motion, the moving Defendants state the following:

### I.    PROCEDURAL BACKGROUND

Plaintiff Daniel Neil Jackson ("Plaintiff"), a Virginia Department of Corrections ("VDOC") inmate, filed a 42 U.S.C. §1983 Complaint against, *inter alia*, Dr. Smith and Nurse Dameron on February 16, 2022. (Doc. 1)[2]. The issues giving rise to the Complaint took place while

---

[1] Other grounds for dismissal were set forth in the Defendants' Motion to Dismiss, (Doc. 41), previously filed. The Motion to Dismiss is fully briefed and ripe for disposition by the Court.
[2] The Augusta Correctional Center was also named as a defendant but was dismissed by Order of the Court on July 8, 2022. (Doc. 6).

Plaintiff was incarcerated at the Augusta Correctional Center ("ACC"). (*Id. generally*). Although the Court's docket reflects that Plaintiff is housed at the ACC, a search of the VDOC Inmate Locator reveals that he is no longer at that facility.[3]

Plaintiff generally alleges in his Complaint that in 2019 he was suffering from pain in his right leg and had been diagnosed with "nerve damage." (*Id.* p. 2). The allegations can be summed up as follows: Before coming to ACC, he was provided with appropriate medical care, but upon arrival at the ACC, the care provided by Dr. Smith was substandard and deliberately indifferent. (*Id., generally*). He also claims that when his pain medications were discontinued, Nurse Dameron denied his requests to see the doctor and that she suggested that he purchase drugs illegally "in the yard." (*Id.* p. 3).

The moving Defendants were served with the Complaint as reflected on the Court's docket. (Doc. 14). At the time the moving Defendants were served, they were employed by VitalCore Health Strategies, LLC. ("VitalCore")[4], but the matters raised in the Complaint by Plaintiff pertained to care and treatment provided to Plaintiff during a period of time while they were employees a different health care contractor: Armor Correctional Health Services, Inc. ("Armor"). Armor did not take over the defense of the lawsuit and, through no fault of either Defendant, the litigation was unattended until a letter from the Court was received at the VitalCore corporate office in Topeka, Kansas advising of Entry of Default in August 2023.

On August 23, 2023, undersigned counsel entered an appearance and filed a Motion to Set Aside Default on behalf of Dr. Smith and Nurse Dameron (Doc. 23) which was later granted by

---

[3] This publicly available database reveals that Plaintiff is housed at the Lawrenceville Correctional Center as of the date of the filing of this pleading.

[4] VitalCore did not begin providing healthcare services to the inmates at the Augusta Correctional Center until December 12, 2021 pursuant to its contract with the Virginia Department of Corrections.

Order of the Court. (Doc. 33).  These Defendants then filed a Waiver of Answer to Plaintiff's Complaint on December 6, 2023. (Doc. 35).  Thereafter, Plaintiff's Motion for Leave to File a *Supplemental* Complaint was granted by the Court. (Doc. 38).  The Plaintiff's Supplemental Complaint was docketed as Doc. 39 by Order of the Court. Per timing provided in an Order of the Court, the Defendants timely filed a Motion to Dismiss (Doc. 41) which addressed many, but not all of Plaintiff's claims against them.  Concurrently, Motions for Enlargement of Time and for Limited Discovery were filed (Docs. 43 and 45) in order to obtain key medical records necessary to respond to the remaining allegations made by Plaintiff that could not be addressed in the Motion to Dismiss. The Defendants now timely file their Motion for Summary Judgment which addresses all remaining claims.

## II.    FACTS AND ALLEGATIONS

For completeness, Plaintiff's version of the "facts" in his original Complaint, (Doc. 1) and the Supplemental Complaint, (Doc. 39), will be outlined and compared.

### A.  Original Complaint

Plaintiff generally alleges in the original Complaint that in 2019 he was suffering from pain in his right leg including the knee, hip, and Achilles, as well as numbness in his heel, and had been diagnosed with "nerve damage" in his right leg. (Doc. 1, p. 2).  At an unidentified correctional facility where he was before coming to the ACC, he claims he was provided with pain medications, an ankle support, was scheduled for further specialist care, and was assigned a bottom bunk. (*Id.*)

**1.    Claim 1** – <u>Asserted against Dr. Smith</u>:  Plaintiff alleges that upon arrival at the ACC in January 2021, the following occurred:

(a) His ankle sleeve was confiscated without justification;

(b) He was put in a pod that required him to climb stairs.  (*Id.*)

He alleges that these two issues caused increased pain in his "damaged" leg and that Dr. Smith failed to follow up on the ankle sleeve issue and failed to address his complaints. (*Id.*).

    2.    **Claim 2** – <u>Asserted against Dr. Smith</u>: Plaintiff alleges that in March 2021, his job at the Apparel Shop at ACC required him to wear boots or have a medical exemption. (*Id.*). He claims that he asked Dr. Smith to issue a medical exemption and that Dr. Smith told him "there is no such thing" and "if there is one, [I] would not issue one."  He also asserts that Dr. Smith had no medical reason for not issuing the medical exemption.  (*Id.*). Plaintiff was thus forced to resign from that job because the boots caused him discomfort, and he took another job that paid less. (*Id.*). He claims he was out of work from June 2021 through January 2022. (*Id.*).

    3.    **Claim 3** – <u>Asserted against Dr. Smith and Derinda Dameron</u>:  Plaintiff claims that in July 2021, a specialist at MCV[5] ordered pain medication and physical therapy but Dr. Smith failed to order the physical therapy the specialist had ordered. (*Id.* p. 3).  Also, Plaintiff alleges that his prescription medications, including ibuprofen, were discontinued in October 2021 although Plaintiff does not identify who discontinued them. (*Id.*).

    Plaintiff further claims that Nurse Dameron told him he could purchase the ibuprofen from the commissary.  (*Id.*).  He also alleges that when he told Nurse Dameron he could not afford to buy ibuprofen, she told him he could buy "suboxone off the yard like everyone else." (*Id.*).  He additionally alleges that Nurse Dameron denied his multiple requests to see the doctor to discuss renewing his medications. (*Id.*).

---

[5] MCV and VCU or Virginia Commonwealth University are used interchangeably as "MCV" is the prior name of this medical institution.

B.    **Supplemental Complaint**

In Plaintiff's Supplemental Complaint, he begins his allegations with an explanation that he came to the ACC from River North Correctional Center, and that it was in February 2021. (Doc. 39, p. 1). He alleges that he had been receiving treatment for "a number of injuries" to his right leg which had resulted in pain and "nerve damage" to the leg. (*Id.*).

1.    **Claim 1** – Asserted against Dr. Smith[6]: Plaintiff claims that he had been previously prescribed a support sleeve for his ankle, pain medicine, a bottom bunk, and scheduled visits with a neurologist. (*Id.*). He further claims that when he arrived at the ACC, the ankle support was confiscated. (*Id.*). He alleges that he asked Dr. Smith to re-issue it, but although Dr. Smith said would look into getting the sleeve reissued and that Dr. Smith understood why it was prescribed and its necessity, Dr. Smith did not reissue ankle brace. (*Id.* p. 2). The result was the deterioration of the muscles in his right leg and a decline in the overall health of the leg.

2.    **Claim 2** - Asserted against Dr. Smith: Plaintiff alleges that in May 2021, he was employed at the Apparel Plant at the prison, and was required to wear boots unless he had medical clearance to wear tennis shoes which was known as a "tennis shoe pass." (*Id.* p. 2). He requested a tennis shoe pass from Dr. Smith, but Dr. Smith "refused to even consider the request." (*Id.* p. 3). He also claims Dr. Smith said the following things to him:

(a)    Plaintiff would either have to suffer the pain and discomfort and possibly risk further damage or quit his job;

(b) "He did not care if others had tennis shoe passes; I would not get one from him." (*Id.*)

---

[6] Although Plaintiff does not use the "claim" terminology in the Supplemental Complaint, it will be used here as well for continuity, as the issues in each pleading also line up similarly.

Plaintiff claims he had to resign from the job for medical reasons and that he was not given another job for six months. (*Id.*)

3.      **Claim 3** – <u>Asserted against Dr. Smith and Derinda Dameron</u>:  Plaintiff alleges that in June 2021, he was seen by a neurologist at MCV who diagnosed him with a bone spur, a knee cyst, muscle atrophy, and nerve damage. (*Id.*).  According to Plaintiff, the neurologist said he should continue treatment for pain (*Id.*) and begin physical therapy (*Id.* p. 4).   However, Plaintiff asserts that even though Dr. Smith was aware of the prescribed treatment plan, he was never provided with physical therapy.   (*Id.*). Plaintiff also claims that he made inquiries about the physical therapy through Nurse Dameron but never received any response. (*Id.*).

4.      **Claim 4** – <u>Asserted against Derinda Dameron</u>[7]:  In October 2021, Plaintiff alleges that he requested renewal of expired pain medications and was informed that they would not be renewed. (*Id.*).   Notably, he does not identify who discontinued the medications or who he asked about the renewal.  He also claims he was told the medications would not be renewed, and that if he needed treatment for pain he could buy over-the-counter medications from the commissary. (*Id.*). Again, the identit(ies) of who was involved in these occurrences is not provided. Although Plaintiff made multiple additional requests, he either got the same response or was ignored. (*Id.*) As before, these allegations are made with absolutely no information about when, where, or who was involved.

Plaintiff also asserts that when he told Nurse Dameron that he could not afford to buy over-the-counter medication from the commissary, she told him to "just do what everyone else does and go buy suboxone off the yard." (*Id.*).

---

[7] Claim 4 in the Supplemental Complaint was included in Claim 3 in the original Complaint.

5.    **Claims  5, 6, 7, 8** – Retaliation – <u>Claims 7 and 8 asserted only against Derinda</u>

<u>Dameron</u>[8]: Plaintiff asserts that from the date he was taken off his medications through August

2023 he suffered from "almost constant pain and discomfort" resulting in "further damages to the

injured leg." (*Id.* p. 5).   Other issues included a loss of sleep, diminished mental health, and

financial burdens due to his attempts to "self-medicate." (*Id.* p. 5).

Plaintiff also alleges that all his attempts to receive help were "outright ignored" due to his

pending lawsuit until August 2023 when a new contractor came in. (*Id.*).   At that time, he was

"immediately" issued a new ankle support and pain medication. (*Id.*).[9]

With regard to the claims against Nurse Dameron, Plaintiff asserts that on October 11,

2023, a note was entered into his chart indicating that his pre-existing bottom bunk status was no

longer indicated. (*Id.*).   Plaintiff claims that he learned from meeting with a physician named Dr.

Gomez that he was still supposed to be on bottom bunk status, and that it was Nurse Dameron that

had removed his bottom bunk privilege on her own accord "upon information and belief" as

retaliation for the pending lawsuit. (*Id.* p. 6).

Plaintiff also claims that on October 12, 2023, Nurse Dameron's husband, Lieutenant

Lokey, an institutional investigator, ordered a urinalysis to be performed on him. (*Id.*).   Plaintiff

claims this was done although he had no history of opioid use and was not displaying signs of

opioid usage. (*Id.*).   He asserts that the only tie to opioids was Nurse Dameron's alleged statement

that Plaintiff should use opioids to treat his pain "which is a significant claim in the 1983 civil

---

[8] A careful reading of Claims 5 and 6 reveal that although retaliation is asserted, no Defendant is mentioned. As such, these two Claims are arguably legal nullities.  As well, Plaintiff himself identifies Claims 7 and 8 as asserted against Nurse Dameron. (Doc. 39, p. 8).

[9] Plaintiff's assertion is factually incorrect, as the healthcare contractor Plaintiff refers to, VitalCore, which was their employer at the time they were served with the Complaint, terminated its contract at the Augusta Correctional Center through the Virginia Department of Corrections on <u>May 24, 2023</u> and not August 2023 as Plaintiff alleges.

suit." (*Id.* p. 7).    Plaintiff further asserts that Lt. Lokey advised Plaintiff after the test that it was positive for the substance his "wife had 'prescribed". (*Id.*).    He further claims that proper procedures were not followed for this urine test, that responses were fraudulently obtained on his records related to the urinalysis, and that due process was violated. (*Id.*).    He was found guilty of a positive urine drug screen resulting in the loss of various privileges for two years and a fine. (*Id.*).

## C.    **Opposition to Supplemental Complaint**

The Defendants again note their Opposition to the Supplemental Complaint as set forth in the Motion to Dismiss, previously filed (Doc. 41).    The Defendants incorporate by reference the arguments raised in their Motion to Dismiss (*Id.*).

## D.    **Summary of Claims and Summary of Arguments**

For completeness and to avoid confusion, the following summary is included here:

| Plaintiff's Claims | Dr. Smith | Derinda Dameron, RN |
|---|---|---|
| Retaliation | n/a | Asserted only against Nurse Dameron. Addressed in the Motion to Dismiss as well as herein as to the evidence presented by Plaintiff in support of his claims. <br><br> Motion to Dismiss: Claims fail as a matter of law <br><br> Motion for Summary Judgment – Claims are conclusory and not supported by the evidence |
| Deliberate indifference | No material fact in dispute that establishes that Dr. Smith was deliberately indifferent to Plaintiff's serious medical needs. Addressed in Motion for Summary Judgment. | Motion to Dismiss - No plausible claim for deliberate indifference against Nurse Dameron. <br><br> Motion for Summary Judgment - No material fact in dispute that establishes that Derinda Dameron was deliberately indifferent to Plaintiff's serious medical needs |

| Plaintiff's Claims | Dr. Smith | Derinda Dameron, RN |
|---|---|---|
| General claims | To the extent Plaintiff makes claims and facts in the Supplemental Complaint against the Defendants that differ from what was alleged in the original Complaint and that did not occur after the filing of the Complaint must be dismissed/stricken as not in compliance with Fed. Rules of Civ. Proc. 15 (a) and/or (d).  Addressed in Motion to Dismiss. | |

The Defendants once again assert that Plaintiff cannot maintain <u>any</u> valid claims against Nurse Derinda Dameron and therefore, all claims against her should be dismissed for the reasons set forth in the Motion to Dismiss alone. The present Motion provides additional support as to the failed deliberate indifference claim and as to the claim for retaliation.  Plaintiff also fails to maintain any valid claims against Dr. Smith as set forth *infra.* As such, these Defendants request that the Court dismiss this entire matter against them, with prejudice.

### E. **Plaintiff's Prayer for Relief**

Plaintiff requests compensatory relief totaling $2,340 per defendant. (Doc. 39 p.8). He also requests punitive damages in the amount of $65,000. (*Id.*).

### F. **Plaintiff's Medical Treatment and Other Relevant Information**

The Declaration of Dr. Smith is attached as Exhibit A.   The Declaration of Derinda Dameron (Lokey) is attached as Exhibit B. Specific relevant medical records from Plaintiff's time at the Augusta Correctional Center are provided in Exhibit C.  Additional information about Plaintiff's medical treatment is also outlined in the Undisputed Material Facts section of this Memorandum *infra*.

### III.  **UNDISPUTED MATERIAL FACTS**

1. The medical care at issue took place during the time Plaintiff was incarcerated at the Augusta Correctional Center. (Docs. 1, 39, *generally*);

2.      Dr. Kyle Smith is a physician licensed in the Commonwealth of Virginia who provided primary care services to inmates at the Augusta Correctional Center and was the Medical Director at that facility from 2018 until May 2023. (Ex. A, ¶ 1). Dr. Smith left the facility in May 2023. (Ex. A, ¶23);

3.      Derinda Dameron, RN is Registered Nurse licensed to practice nursing in the Commonwealth of Virginia. She was employed at the Augusta Correctional Center as the Health Services Administrator during a portion of the times relevant to this litigation, and her role was administrative with oversight of health care. (Ex. B, ¶¶ 1, 4);

4.      Nurse Dameron was not involved in disciplinary matters involving prisoners which is the purview of correctional officers, not medical staff. (Ex. B, ¶ 20);

5.      The Augusta Correctional Center houses approximately 1200 inmates. (*Id.*);

6.      Mr. Jackson was transferred to the Augusta Correctional Center from River North Correctional Center on or about 2/10/2021 (Ex. A, ¶6; Ex. C, FR-SDT-VDOC-0147).   His medications were: Ibuprofen (an over-the-counter anti-inflammatory), Cymbalta (can be used for anxiety and pain relief), and Metamucil (for constipation). (*Id.*). His current medical issues were identified as "numbness/pain from knee to foot, right sided." (*Id.*);

7.      He was seen by an LPN per the usual custom for an intake assessment on the date of his arrival and was found to be in no acute distress and with normal vital signs.  The patient reported "numbness, tingling and pain from knee to foot causing inability to climb the ladder requiring a bottom bunk."  This resulted in a referral to be seen by Dr. Smith. (Ex. A, ¶7; Ex. C, FR-SDT-VDOC-0146);

8.      Dr. Smith first saw the Plaintiff on 2/18/2021 and ensured that his medication orders were up to date. He then placed a request for Plaintiff to be seen by a neurosurgeon, an

outside treater requiring approval, regarding the leg complaints. (Ex. A, ¶8; Ex. C, FR-SDT-VDOC-0143);

9.      On 3/9/2021, Mr. Jackson was seen in the Medical clinic by C. Russell, RN, in anticipation of his upcoming visit with the neurosurgeon. At that time the Plaintiff mentioned to this nurse that he wanted "return of right ankle brace" which he claimed he had requested previously, and there was discussion of bottom bunk status. This nurse noted "will check with Ms. Hall…" (Ex. A, ¶9; Ex. C, FR-SDT-VDOC-0143);

10.     Plaintiff was seen on 3/10/2021 by Dr. John Ward, a neurosurgeon from Virginia Commonwealth University, for the complaints of pain and numbness in his right leg. Dr. Ward documented that he had seen the patient previously and that an MRI of the leg had been done previously and was normal. As well, he documented that a lumbar MRI "also looks fairly benign." Because of the results of an EMG study, previously done and the negative MRIs, Dr. Ward planned to consult with a peripheral nerve surgeon there at VCU. (Ex. A, ¶10; Ex. C, FR-SDT-VDOC-096-097);

11.     That same day, the ACC facility nurse documented that the neurosurgery visit had taken place and what the plan was going to be. The chart was then sent to Dr. Smith for his review. (Ex. A, ¶11; Ex. C, FR-SDT-VDOC-0142);

12.     On 3/16/2021, Dr. Smith saw Mr. Jackson in the Medical clinic to review the treatment plan with him. Dr. Smith noted that Plaintiff was in no acute distress and had a normal gait. The plan was for a bottom bunk pass and to contact the neurosurgeon/obtain the neurosurgery records. (Ex. A, ¶12; Ex. C, FR-SDT-VDOC-0014, 0142);

13.     Dr. Smith placed a referral for a neurosurgery follow up on 4/14/2021 classifying it as "urgent" to ensure Mr. Jackson would be seen expeditiously. (Ex. A, ¶13; Ex. C, FR-SDT-VDOC-0095; 0141);

14.     On 5/8/2021, there is documentation in the medical records by a facility nurse following a report by the inmate that he had started working in the tailor shop and needed to wear boots. He was requesting a physician order to wear tennis shoes or modified boots.  The nurse referred Mr. Jackson to Dr. Smith. (Ex. A, ¶14; Ex. C, FR-SDT-VDOC-0140);

15.     Dr. Ward, the neurosurgeon, saw Mr. Jackson again on 5/12/2021.  Dr. Ward noted that the patient had "totally normal muscle function of his right lower extremity." He also documented that while there was numbness in the heel, the involved muscles "all were within normal limits."  In addition, he commented "in the absence of any weakness in his right foot there is no point in exploring his nerve".  The plan was to have him seen by orthopedics in regard to a Baker cyst in the back of his leg. (Ex. A, ¶15; Ex. C, FR-SDT-VDOC-0091-0093);

16.     Dr. Smith next saw Mr. Jackson on 6/3/2021.  He was requesting a "shoe pass" so he could wear tennis shoes at work. Prior to this clinic visit, Dr. Smith had reviewed the visit note and documentation by Dr. Ward and noted that the neurosurgeon had evaluated Plaintiff and found normal strength and muscle function and did not recommend surgery. On the date Dr. Smith saw Mr. Jackson, he was in no acute distress and his gait was normal.  Dr. Smith discussed the shoe request with Mr. Jackson and advised him that based on his assessment as well as the findings by the neurosurgeon, there was no medical reason why he could not wear the boots to his job, which would offer much more protection than a tennis shoe.  Dr. Smith documented in the medical records that Mr. Jackson became angry and threatened to file a lawsuit against him. (Ex. A, ¶16;

Ex. C, FR-SDT-VDOC-0134). Nonetheless, Dr. Smith made a referral for the orthopedic consult as had been recommended by Dr. Ward. (*Id.*);

17.    Dr. Smith's decision on the tennis shoe pass was not a blanket refusal, but rather, was based on Plaintiff's clinical condition. Dr. Smith did not tell Plaintiff he would have to "suffer" or that he "did not care." (Ex. A, ¶¶ 26, 27);

18.    The Plaintiff was seen by VCU Orthopedics on 7/12/2021. X-rays were obtained that day in the orthopedic clinic and there were no acute findings. The orthopedic specialist explained to the patient that the numbness in his foot was not related to his Achilles and a recommendation was made for arch supports and heel pads.  As well, this specialist showed Mr. Jackson how to do stretching exercises. (Ex. A, ¶17; Ex. C, FR-SDT-VDOC-0087-0089).  The recommendation from the specialist was for symptomatic treatment with anti-inflammatory medication as needed, arch supports, and activity as tolerated. (*Id.*);

19.    That same day, Dr. Smith wrote an order for the arch supports as recommended by the orthopedic specialist and also noted that self-performed stretching exercises had been recommended for the right ankle. (Ex. A, ¶18; Ex. C, FR-SDT-VDOC-00090);

20.    Dr. Smith saw Mr. Jackson on 7/27/2021 in the clinic for a follow up visit and reviewed the recommendation from orthopedics including the exercises he could do on his own at the facility. Dr. Smith also renewed his ibuprofen (an anti-inflammatory) and Cymbalta. (Ex. A, ¶19; Ex. C, FR-SDT-VDOC-0131);

21.    There were never any recommendations made by the specialist for physical therapy contrary to Plaintiff's allegations – only for stretching exercises he could do himself. (Ex. A, ¶ 28; Ex. B, ¶6; Ex. C, FR-SDT-VDOC-0087-0089);

22.     There is no documentation in the records about requests for physical therapy being submitted by Plaintiff to Nurse Dameron. (Ex. B, ¶ 7);

23.     On 8/19/2021, one of the facility nurses, V. Hall, RN, issued the arch supports to Mr. Jackson that Dr. Smith had previously ordered. (Ex. A, ¶20; Ex. C, FR-SDT-VDOC-0131);

24.     On 6/19/2022, Dr. Smith renewed Plaintiff's bottom bunk assignment. (Ex. A, ¶22; Ex. C, FR-SDT-VDOC-0014);

25.     Dr. Smith continued to see Plaintiff for his various medical needs until his departure in May 2023. (Ex. A, ¶¶21, 23);

26.     On 11/14/2023, Mr. Jackson was scheduled by V. Hall, RN to see the doctor about his bunk request. (Ex. B, ¶19; Ex. C, FR-SDT-VDOC-0111). Dr. Smith was no longer at the facility at this time.  Mr. Jackson was seen later that day by the provider who noted that the patient was able to function normally, ambulates well, and did not meet requirements for a bottom bunk. The provider also noted that neurosurgery and orthopedics had signed off on further care. (*Id.*).

27.     Nurse Dameron was not involved in the bunk assignment change at all. (Ex. B, ¶19);

28.     On 12/14/2023, Plaintiff was seen he was seen by J. Shields, Nurse Practitioner, and the records reflect that he was requesting suboxone for pain issues. He reported using suboxone daily "though shows reluctance to disclose exactly when he last used." (Ex. A, ¶14; Ex. C, FR-SDT-VDOC-0109);

29.     On 12/20/2023, he was seen again by J. Shields, Nurse Practitioner, and the records reflect that his craving to use opioids was lessened when using suboxone. He also reported that suboxone helped his mood. (Ex. A, ¶15; Ex. C, FR-SDT-VDOC-0058);

30.    On 2/22/024, he was seen by Dr. Gregory Saathoff, psychiatrist, and Plaintiff admitted to long-term addiction and that he had been self-medicating with suboxone. (Ex. A, ¶16; Ex. C, FR-SDT-VDOC-0025);

31.    There was never a plan nor any recommendation made by any specialist for an ankle brace while Dr. Smith was at the Augusta Correctional Center, and Dr. Smith did not tell Plaintiff that he would issue one at any time. (Ex. A, ¶24; Ex. C, *generally*);

32.    No consulting specialist - including a neurosurgeon, nerve surgeon, and orthopedist - ever mention anything about a "deterioration" of the health of Plaintiff's right leg. (Ex. A, ¶25; Ex. C, *generally*);

33.    At some point Mr. Jackson's medications were discontinued due to poor compliance. However, Nurse Dameron was not involved in the discontinuation of his medications nor were requests made to her for renewal. (Ex. B, ¶10);

34.    Ibuprofen, one of the discontinued medications, is available to inmates at the prison commissary without a prescription. (*Id.*);

35.    Nurse Dameron cannot prescribe medications as a registered nurse and did not tell Plaintiff to purchase suboxone "off the yard."( Ex. B, ¶¶ 12, 13).

## IV.    LAW AND ARGUMENT

### A.    Standard of Review

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also, Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "When a motion for summary judgment is made . . . an adverse party may not rest upon the mere

allegations or denials of the adverse party's pleading, but the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A genuine issue is present only if a reasonable jury could return a verdict for the nonmoving party and a court should not consider irrelevant or unnecessary factual disputes. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Further, the facts which a moving party bears the burden of proving are those which are material: materiality is dictated by "the substantive law". *Id.* at 248.

Once a moving party has met its burden of proof, the non-moving party must produce specific facts to generate a disputed issue for trial. *Matsushita Elec. Indus. Co. v Zenith Radio Corp.* 475 U.S. 574, 575 (1986). A court must enter judgment against a party who fails to establish the existence of an essential element of his claim that he has the burden of proving at trial. *Johnson v. Quinones*, 145 F.3d 164, 166-167 (4th Cir. 1998). While the court does view the evidence in the light most favorable to the non-moving party, *Porter v U.S. Alumoweld Co.,* 125 F. 3d 243, 245 (4th Cir. 1997), "[o]nly disputes over facts which might affect the outcomes of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson* at 248. Further, the "mere existence of some alleged factual dispute" cannot defeat a motion for summary judgment; the dispute must be both "material" and "genuine", meaning that it "might affect the outcome of the suit under the governing law". *Hooven-Lewis v Caldera*, 249 F.3d 259, 265 (4th Cir. 2001); *Webb v. Crest Ultrasonics Corp.,* 2019 U.S. Dist. LEXIS 204092, at *6 (W.D. Va. Nov. 22, 2019).

In addition, while district courts must view *pro se* complaints with a "special judicial solicitude," that requirement "does not transform the court into an advocate." *Weller v. Department of Social Services*, 901 F.2d 387, 391 (4th Cir. 1990); *Wood v. Jamaludeen*, 2021 WL 77780, at *3 (E.D. Va. Jan. 8, 2021). As set forth *infra*, Plaintiff's §1983 claims against Dr. Smith

and Nurse Dameron should be dismissed because there is no <u>material</u> fact in dispute that establishes that these Defendants were deliberately indifferent to Plaintiff's serious medical needs. As well, in addition to the reasons previously raised in the Motion to Dismiss (Doc. 41) for dismissal of the claim for retaliation against Nurse Dameron, the only basis for his allegations are purely conclusory. Importantly, conclusory claims without evidentiary support are not sufficient to defeat a summary judgment motion. *Braithwaite v Hinkle*, 752 F. Supp. 2d 692, 694 (E.D. Va. 2010), *aff'd*, 412 F. App'x 583 (4th Cir 2011).

## 1. <u>Standard of Review for Deliberate Indifference</u>

To find a violation of the Eighth Amendment, a prison official must have a sufficiently culpable state of mind. *Farmer v. Brennan*, 511 U.S. 825, 834, (1994) (Internal citations omitted). That state of mind in prison cases dealing with inmate health or safety is "deliberate indifference." (*Id.*). This was first defined by the United States Supreme Court in *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); see also *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir.2001). This now longstanding, and thus, well-defined term known as "deliberate indifference" is comprised of both objective and subjective components. *Farmer* 511 U.S at 834; *Hicks v. James*, 255 F. App'x 744, 749 (4th Cir.2007). As well, to support a §1983 claim for failure to provide adequate medical care, a plaintiff must show that a defendant's "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle* 429 U.S. at 106.

In addition, a viable 43 USC §1983 claim cannot be based on mere conclusory allegations. The Fourth Circuit instructs that the court is not required to accept as "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002). Nor must it "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit." *Id., see also* Fed. R. Civ. P. 10(c). *See*

*also United States v. Roane*, 378 F.3d 382, 400-01 (4th Cir. 2004) (concluding that "[a]iry generalities [and] conclusory assertions . . . [do] not suffice to stave off summary judgment . . . ."

### a. <u>Plaintiff Must Show Both Objective and Subjective Components</u>

#### (i)    <u>Objective component</u>

Under the constitutional analysis, Plaintiff must establish first that there was a sufficiently serious medical need. A serious medical need is one that poses a substantial risk of serious injury to an inmate's health and safety. *Young v City of Mt. Rainier*, 238 F.3d 567, 576 (4th Cir. 2001); *Cooper v Dyke*, 814 F.2d 941, 945 (4th Cir. 1987). The Defendants do not concede that Mr. Jackson had a "serious medical need." He alleges that he had "a number of injuries" to his right leg which had resulted in pain and "nerve damage" upon arrival at the ACC (Doc. 39, p. 1). This is sufficiently vague and does not necessarily describe a serious medical need, which is defined as "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Adams v. Ferguson*, 884 F.3d 219, 227 (4th Cir. 2018). Further, an examination of the evidence reveals that even though he reported numbness in his right leg, he was seen upon referral by Dr. Smith by two specialists at VCU – a neurosurgeon and an orthopedic specialist. The conclusion was that all Plaintiff needed was conservative treatment and specifically symptomatic treatment with ibuprofen as needed, arch support in his shoes, and stretching exercises. (Ex. C, FR 087-093). Clearly not every malady suffered by an inmate is a "serious medical need" for purposes of the *Estelle* analysis. Here, the Defendants assert that the objective evidence, even when viewed in the light most favorable to Plaintiff, does not support a finding that Plaintiff had a serious medical need.

Taking all the evidence together, the reasonable inference to be drawn is that Plaintiff did <u>not</u> have a serious medical need during the times relevant to this litigation, and therefore, the first prong of the analysis fails. As such, one need go no further in the analysis as both prongs must be satisfied in order to establish a constitutional violation

(ii)    <u>Subjective component</u>

To satisfy the subjective component, Plaintiff must make "a showing that the defendant ... actually knew of and ignored [an inmate's] serious need for medical care." *Young v. City of Mount Ranier*, 238 F.3d 567, 575–76 (4th Cir. 2001) (citing *White ex rel. White v. Chambliss*, 112 F.3d 731, 737 (4th Cir.1997)).  Further, "the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier* v. *Beorn,* 896 F.2d 848, 851 (4th Cir. 1990).  "[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."  *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).  In other words, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.  There is no liability for a prison official who "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent."  *Id.* at 844; *see Rich v. Bruce*, 129 F.3d 336, 338 (4th Cir. 1997) (finding no liability where prison official did not actually draw the inference of a serious risk of harm).

a)    <u>Dr. Smith</u>

Here, there is no evidence whatsoever that Dr. Smith "knew of and ignored" Mr. Jackson's need for medical care as he claims. An examination of the records instead reveals that Dr. Smith provided the Plaintiff with assessments, orders/authorizations for outside referrals to specialists as

indicated, ongoing treatment, medications, and close follow up.  There is absolutely no action or inaction on the part of Dr. Smith that can be said to have been one that was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Indeed, his treatment of Mr. Jackson was careful, thoughtful, and reasonable.  Indeed, it was the opposite of "indifferent." Dr. Smith never hesitated to authorize referrals in order to maximize Mr. Jackson's health in regard to the pre-existing right leg issues.

As soon as Mr. Jackson arrived at the ACC, Dr. Smith ensured that his medication orders were up to date, then Dr. Smith placed a request for him to be seen by a neurosurgeon regarding the leg complaints. (Ex. A, ¶ 8; Ex. C, FR-SDT-VDOC-0143).  Thereafter, Dr. Smith continued to see Mr. Jackson and provide referrals to specialists including for follow up with the neurosurgeon and an orthopedic specialist as recommended by the neurosurgeon. (Ex. A, *generally;* Ex. C *generally*).  Dr. Smith also ordered a bottom bunk pass for Mr. Jackson for two years (Ex. A, ¶¶ 12, 22; Ex. C.  FR-SDT-VDOC-0014, 0142).   He additionally wrote an order for the arch supports that were recommended by the orthopedic specialist. (Ex. A ¶18,; Ex. C, FR-SDT-VDOC-00090) and also prescribed anti-inflammatory medications. (Ex. A ¶19; Ex. C, FR-SDT-VDOC-0131). No inference can be drawn that Dr. Smith disregarded Mr. Jackson's medical needs. It follows that there can be no deliberate indifference when the defendant physician was conscientiously plugged in to this Plaintiff's health care needs and was addressing them.

Furthermore, a claim concerning a disagreement between an inmate and medical personnel regarding diagnosis and course of treatment does not support a cognizable claim except in extraordinary circumstances.  *Wright v. Collins,* 766 F.2d 841, 849 (4th Cir. 1985).  Instead, "[p]rison officials evince deliberate indifference to a serious medical need by completely failing to consider an inmate's complaints or by acting intentionally to delay or deny the prisoner access

to adequate medical care." *Hicks v. James*, 255 F. App'x 744, 749 (4th Cir.2007).    Questions of medical judgment are not subject to judicial review.  *Russell v. Sheffer,* 528 F.2d 318 (4th Cir. 1975).  While Mr. Jackson may have thought some particular treatment was necessary or believed an ankle brace or special shoe was required, Dr. Smith used his medical judgment to form an appropriate treatment plan for this inmate in collaboration with the recommendations made by outside specialists.

Comparing the Plaintiff's allegations to the medical records and other evidence demonstrates one thing very clearly: they are conclusory, unsupported, and at best, amount to nothing more than a disagreement with the medical care provided. Mr. Jackson's healthcare needs and in particular, his right leg issues were thoroughly addressed by Dr. Smith, contrary to his assertions.  The Court should not accept Plaintiff's self-serving and unsupported statements that are contradicted by the evidence.

In sum, a prison healthcare provider is not deliberately indifferent if he or she responds reasonably to the risks about which he or she knows.  *Brown v. Harris*, 240 F.3d 383, 390-91 (4th Cir. 2001).  Such an official is not deliberately indifferent simply for failing to take all actions or precautions that he or she could have taken or even should have taken.  *Id*.  "Deliberate indifference is a very high standard; a showing of mere negligence will not meet it."  *Grayson v Feed*, 195 F.3d 692, 695 (4th Cir. 1999).  There is absolutely no evidence that Dr. Smith was deliberately indifferent to Mr. Jackson at any time.

b)  Nurse Dameron

The sum total of allegations against Nurse Dameron is as follows: in the Complaint (Doc. 1) Plaintiff alleges that his prescription medications, including ibuprofen, were discontinued in October 2021 (*Id.* p. 3) although Plaintiff does not identify who discontinued them. (*Id. generally*).

In the Supplemental Complaint, (Doc. 39), he makes this same claim, (*Id.* p. 4) again without identifying who discontinued the medications. He does not identify in either pleading <u>who</u> discontinued the medications or who he asked about the renewal. As such, it is reasonable to conclude that these allegations are not directed at Nurse Dameron.

Plaintiff further claims in the Complaint that after the ibuprofen was discontinued, Nurse Dameron told him he could purchase this medication from the commissary. (Doc. 1, p. 3; Doc. 39, p. 4). He also alleges that when he told Nurse Dameron he could not afford to buy ibuprofen, she said he could buy "suboxone off the yard like everyone else." (*Id.*). He additionally alleges that Nurse Dameron denied his multiple requests to see the doctor to discuss renewing his medications. (Doc. 1, p. 3).

In the Supplemental Complaint, (Doc. 39), Plaintiff additionally alleges that a neurologist recommended physical therapy which Dr. Smith failed to order, (*Id.* p. 4), that when he made inquiries about the physical therapy through Nurse Dameron, he never received any response. (*Id.*).

He also alleges that in October 2023, he was taken off bottom bunk status, and then he learned that it was Nurse Dameron that had removed his bottom bunk privilege on her own accord "upon information and belief" as retaliation for the pending lawsuit. (*Id.* p. 6). He further claims that Nurse Dameron's husband, an institutional investigator, caused him to submit to a urinalysis drug screen which was positive for suboxone, which she had "prescribed", and which was performed and obtained by "fraudulent" means as retaliation for the pending litigation. (*Id.*).

Examination of the actual evidence in the case paints a very different picture. First, when Plaintiff was seen in <u>July</u> 2021 at MCV by an <u>orthopedic</u> specialist, that provider explained to the patient that the numbness he was having in the foot was not related to his Achilles and recommended arch supports and heel pads. (Ex. A, ¶ 17; Ex. B¶6; Ex. C, FR-SDT-VDOC-0087-

0089).  As well, this specialist showed him how to do stretching exercises on his own. (*Id*).  The recommendation from the specialist was for symptomatic treatment with anti-inflammatory medication, as needed, arch supports, and activity as tolerated. (*Id*). There was no order or recommendation for physical therapy, but instead, only exercises for him to do on his own. (Ex. B¶6; Ex. C, FR-SDT-VDOC-0087-0089).

As well, the records contain no documentation about request to Nurse Dameron about physical therapy and she has no recollection about any such request. (Ex. B, ¶7; Ex. C, *generally*). However, the records do reflect that Mr. Jackson was seen by Dr. Kyle Smith, the Medical Director, on 7/27/2021, who reviewed the recommendation for the self-performed exercises with Plaintiff. (Ex. A ¶ 19; Ex. B, ¶7; Ex. C, FR-SDT-VDOC-0131).

With regard to the discontinuation of medications, Nurse Dameron was not involved with the discontinuation of his medications nor were any requests made to her for renewals. (Ex. B, ¶10). However, ibuprofen, which is the medication that was recommended by the orthopedic specialist, is always available to inmates at the commissary. (*Id.*). A prescription is not needed. (*Id.*).   To the extent Plaintiff tries to rebut this argument by asserting that she was aware of his medications or should have been, this is not enough.  To establish personal liability under § 1983, a plaintiff must affirmatively show that the official charged acted <u>personally</u> in the deprivation of the plaintiff's rights. That is, the official's own individual actions must have violated the Constitution, and "mere knowledge of such a deprivation does not suffice." *Williamson v. Stirling*, 912 F.3d 154, 171 (4th Cir. 2018).

Further, Nurse Dameron denies telling Mr. Jackson to "buy suboxone off the yard" or anything similar,  (Ex. B, ¶ 12). She also cannot prescribe medications as a registered nurse. (Ex. B, ¶ 12).  Moreover, Plaintiff's medical records contain multiple references to his use of this

medication, his reluctance to reveal where he was obtaining it, and self-medication with it. (Ex. B, ¶¶ 14, 15, 16; Ex. C, FR-SDT-VDOC- 0025, 0058, 0109).  Nurse Dameron denies any involvement with suboxone and this Plaintiff.  (Ex. B, ¶ 17).

Further, Nurse Dameron was not involved at all in the discontinuation of Plaintiff's bottom bunk status. (Ex. B, ¶¶ 18. 19). Although the bunk status was changed around November 2023, the records reveal that this was done by a provider at the prison because Mr. Jackson no longer qualified medically for the bottom bunk.  This provider documented upon examination that the patient was able to function normally, ambulated well, and did not meet requirements for a bottom bunk. (Ex. B, ¶ 19; Ex. C, FR-SDT-VDOC-0111). The provider also noted that neurosurgery and orthopedics had signed off on further care. (*Id.*).  In addition, Nurse Dameron had no personal involvement in any of these matters. Absent such personal involvement, she cannot be held liable under 42 § 1983.

Lastly, with regard to Plaintiff's unsupported claims about the urine testing with resultant disciplinary action, Nurse Dameron disavows personal involvement as well as any influence over the actions of Lt. Lokey or any other correctional officer at the ACC.  (Ex. B, ¶ 20). Nurse Dameron's responsibility was oversight of medical staff, and not disciplinary matters involving prisoners which is the purview of correctional officers. (Ex. B, ¶¶ 4, 21).

Plaintiff's criticisms of Nurse Dameron are all entirely conclusory and factually unsupported. Beyond Plaintiffs self-serving allegations - which are all denied by Nurse Dameron and which are not supported by the documentation in the medical records themselves - there is no evidence from which an inference could be drawn that Nurse Dameron was aware of any "substantial risk of serious harm" to Plaintiff.

It is also required to show deliberate indifference that the health care provider's actions were "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier*, 896 F.2d at 851. The allegations against Nurse Dameron, even if viewed in the light most favorable to Plaintiff, do not rise to this level. She certainly did not "know of and ignore his serious need for medical care" and no facts exist from where such an inference can be drawn.

## V.    <u>CONCLUSION</u>

Plaintiff has failed to support any valid claims of constitutional violations against him on the part of these Defendants. No rational finder of fact could determine that Dr. Smith or Nurse Dameron violated the Plaintiff's civil rights.

WHEREFORE, for the foregoing reasons, Defendants Kyle Smith, M.D. and Derinda Dameron, RN, respectfully pray that the Court grant this Motion for Summary Judgment and dismiss the claims against them in accordance with the arguments set forth above, with prejudice, and for any other relief the Court deems just and proper.

Respectfully submitted,

**KYLE SMITH, MD and**
**DERINDA DAMERON, RN**

      /s/   *Grace Morse McNelis*
Grace Morse-McNelis, Esq., VSB No. 75957
Ericka W. Kopp, Esq. VSB No. 98265
Frith Anderson + Peake
4198 Cox Road, Suite 102
Glen Allen, VA 23060
Phone – (804) 362-0078
Fax – (540) 772-9167
gmorsemcnelis@faplawfirm.com
ekopp@faplawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of June, 2024, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system and I further certify that I will mail the document

by U.S. mail to the following non-filing user:

Daniel Neil Jackson, 1182398
VADOC Centralized Mail Distribution Center
3521 Woods Way
State Farm, Virginia 23160
Plaintiff, *pro-se*

        /s/   *Grace Morse McNelis*
Grace Morse-McNelis, Esq., VSB No. 75957
Ericka W. Kopp, Esq. VSB No. 98265
Frith Anderson + Peake
4198 Cox Road, Suite 102
Glen Allen, VA 23060
Phone – (804) 362-0078
Fax – (540) 772-9167
gmorsemcnelis@faplawfirm.com
ekopp@faplawfirm.com