CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED
March 20, 2025
LAURA A. AUSTIN, CLERK
BY: s/J.Vasquez
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| DANIEL NEIL JACKSON, | ) | |
| Plaintiff, | ) ) ) | Civil Action No. 7:22-cv-00090 |
| v. | ) ) | |
| D. DAMERON, RN, *et al.*, | ) ) | By: C. Kailani Memmer<br>United States Magistrate Judge |
| Defendants. | ) | |

### MEMORANDUM OPINION

Plaintiff Daniel Neil Jackson, a Virginia inmate proceeding *pro se*, filed this civil action under 42 U.S.C. § 1983 against D. Dameron, RN ("Nurse Dameron"), and Kyle Smith, MD ("Dr. Smith"). Jackson claims the defendants acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment.

The case is before me by the parties' consent under 28 U.S.C. § 636(c). *See* ECF No. 26. Presently before me is the defendants' motion for summary judgment. ECF No. 55. Jackson responded to the motion, ECF No. 65, the time for filing any additional argument or evidence in response to the motion has expired, ECF No. 66, and the motion is ripe for review. For the reasons set forth below, the motion for summary judgment is **GRANTED**.

### I.  BACKGROUND

**A.  Jackson's Allegations and Claims**

Jackson is in the custody of the Virginia Department of Corrections ("VDOC"). He was previously incarcerated at Augusta Correctional Center ("Augusta"), and his Eighth Amendment claims stem from events that allegedly occurred there between February 2021 and November 2023.

The following allegations are drawn from Jackson's verified original complaint and his unverified supplemental complaint.[1] *See* Compl., ECF No. 1; Supp'l Compl., ECF No. 39.

The VDOC transferred Jackson to Augusta in February 2021. Jackson alleges he was diagnosed with nerve damage in his right leg approximately two years prior to the transfer and he was "prescribed medications for pain, given an ankle sleeve for support, assigned bottom bunk status, and scheduled for further specialist care." Compl. 2. After he arrived at Augusta, "the prescribed ankle support was confiscated by property pending reissue by medical." Supp'l Compl. 2. Jackson alleges he met with Dr. Smith on several occasions and requested a support sleeve be reissued for his ankle. *Id.* However, Dr. Smith "refused to even follow-up on this matter." Compl. 2.

In May 2021, Jackson was hired to work in the apparel shop at Augusta. Supp'l Compl. 2. The employee dress code required that he wear boots to work unless he received a medical exemption. *Id.* Because the hard-soled boots issued by the VDOC increased the pain and numbness in his right leg, Jackson asked Dr. Smith to issue a medical exemption known as a "tennis shoe pass," but Dr. Smith refused to do so. *Id.* at 2–3. Jackson ultimately resigned from the apparel shop because of the pain and discomfort he experienced wearing the required boots. *Id.* at 3.

Jackson alleges he subsequently saw an outside specialist who "prescribed soft, supportive insoles as treatment." Compl. 2. He further alleges a specialist recommended he "begin physical therapy to prevent further decline." Suppl. Compl. 3–4. Jackson claims that despite being aware of the treatment recommended by the specialist, neither Dr. Smith nor Nurse Dameron responded

---

[1] "A complaint is 'verified' if it is 'signed, sworn, and submitted under penalty of perjury.'" *Goodman v. Diggs*, 986 F.3d 493, 495 n.2 (4th Cir. 2021) (quoting *James v. Hale*, 959 F.3d 307, 314 (7th Cir. 2020)). A verified complaint is "the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge." *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).

2

to his requests to begin physical therapy. *Id.* at 4; *see also* Compl. 3 ("Dr. Smith has never given me any physical therapy, nor has he issued any prescribed physical therapy.").

Jackson alleges his prescription medications, including ibuprofen, were discontinued in October 2021 and he was advised "if he needed treatment for pain he could 'buy over-the-counter meds from [the] commissary.'" Supp'l Compl. 4. Jackson subsequently submitted "multiple requests to medical regarding his ongoing pain and was given similar responses or was ignored." *Id.* Jackson subsequently told Nurse Dameron he "could not afford to regularly purchase the dosage [he] was taking." Compl. 3. He alleges Nurse Dameron informed him he should "just buy some suboxone off the yard like everyone else does." *Id.*; *see also* Supp'l Compl. 4–5.

Jackson alleges he continued to experience pain and discomfort until August 2023, when Augusta "began a contract with a new provider and had another doctor coming in to treat inmates." Supp'l Compl. 5. At that point, Jackson was "reissued his ankle support sleeve, new insoles, and medication for the treatment of pain." *Id.*

Jackson alleges he met with the new doctor in November 2023, after learning that his bottom bunk status was discontinued. *Id.* at 6. Jackson asserts, on information and belief, that Nurse Dameron was responsible for the decision. *Id.*

Based on the foregoing allegations, Jackson claims Dr. Smith and Nurse Dameron acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment. In particular, Jackson claims Dr. Smith violated the Eighth Amendment by (1) failing to reissue him an ankle sleeve after he arrived at Augusta; (2) refusing to issue a medical exemption that would have permitted him to wear tennis shoes while working in the apparel shop at Augusta; and (3) failing to order the physical therapy allegedly prescribed by a specialist. Jackson claims Nurse Dameron violated the Eighth Amendment by (1) failing to respond to his requests for physical

3

therapy; (2) failing to help him renew his prescriptions after he told her that he could not afford to purchase medication from the commissary; and (3) discontinuing his bottom bunk status.

**B.      Defendants' Evidence**

In support of the pending motion for summary judgment, Dr. Smith and Nurse Dameron submitted their own declarations, along with various medical records. According to the declarations, Dr. Smith provided primary care services to inmates at Augusta and was the Medical Director at that facility from 2018 until May 2023. Smith Decl. ¶ 1, ECF No. 56-1. Nurse Dameron was employed as the Health Services Administrator at Augusta during a portion of the time period relevant to this action. Dameron Decl. ¶ 1, ECF No. 56-2. In that administrative role, Nurse Dameron's duties "involved the oversight of the nursing care at the facility and staffing of medical personnel generally." *Id.* ¶ 4. As a registered nurse, she could not prescribe medications. *Id.* ¶ 14.

Jackson's medical records indicate he was transferred to Augusta on or about February 10, 2021. Smith Decl. ¶ 6 (citing FR-SDT-VDOC-000147).[2] He arrived at the facility with the following medications: ibuprofen, "an over-the-counter anti-inflammatory";[3] Cymbalta, which "can be used for anxiety and pain relief"; and Metamucil for constipation. *Id.* His existing medical issues were identified as "numbness/pain from knee to foot, [right] sided." FR-SDT-VDOC-000147. The licensed practical nurse responsible for performing an intake assessment noted Jackson complained of "numbness, tingling [and] pain from knee to foot on [right] side causing an inability to climb the ladder requiring a bottom bunk." FR-SDT-VDOC-000146. Based on his complaints, Jackson was referred to Dr. Smith. Smith Decl. ¶ 7.

---

[2] When citing to the compilation of medical records available at ECF No. 56-3, I will use the Bates numbering found in the lower right corner of the documents.

[3] Ibuprofen is in a class of medications referred to as "NSAIDs" (nonsteroidal anti-inflammatory drugs). *See* Ibuprofen, U.S. National Library of Medicine: Medline Plus, https://medlineplus.gov/druginfo/meds/a682159.html (last visited Mar. 11, 2025).

4

Dr. Smith first saw Jackson on February 18, 2021. *Id.* ¶ 8 (citing FR-SDT-VDOC-000143). At that time, Dr. Smith verified Jackson's medication orders were up to date. *Id.* He also placed a request for Jackson to be seen by a neurosurgeon regarding his leg complaints. *Id.*

On March 9, 2021, Jackson was seen in the medical clinic by C. Russell, RN, in anticipation of the upcoming appointment with a neurosurgeon. *Id.* ¶ 9 (citing FR-SDT-VDOC-000143). The nurse reported Jackson mentioned wanting "return of right ankle brace," which he claimed to have previously requested. FR-SDT-VDOC-0143. The nurse noted she would "check [with] Ms. Hall for visit referral." *Id.*

On March 10, 2021, Jackson had an appointment with Dr. John Ward, a neurosurgeon at VCU Medical Center. FR-SDT-VDOC-000096. Dr. Ward noted that he had previously seen Jackson for complaints of pain and numbness in his right leg and foot, and that Jackson had undergone an "EMG which was interpreted as showing nerve compression." *Id.* Dr. Ward also noted Jackson "recently had an MRI of his leg which was read as normal" and that a "lumbar MRI also look[ed] fairly benign with no evidence of any stenosis or ruptured disc." *Id.* Since the objective studies were "a bit conflicting," Dr. Ward reported he planned to have a peripheral nerve surgeon review the studies and determine whether surgery needed to be explored. FR-SDT-VDOC-000097.

On March 16, 2021, Dr. Smith saw Jackson in the medical clinic to review the neurosurgeon's plan with him. Smith Decl. ¶ 12 (citing FR-SDT-VDOC-000142). Although Jackson continued to complain of pain and numbness, Dr. Smith found Jackson was in no acute distress and had a normal gait. FR-SDT-VDOC-000142. Dr. Smith noted he was going to contact Dr. Ward for further information. *Id.* He also ordered Jackson be assigned to a bottom bunk for 365 days. FR-SDT-VDOC-000014.

5

On April 14, 2021, Dr. Smith requested Jackson be referred for a neurosurgery follow-up appointment. FR-SDT-VDOC-000095. Dr. Smith classified the referral as "urgent" to ensure Jackson would be seen expeditiously. Smith Decl. ¶ 13. The referral request was approved on April 15, 2021. FR-SDT-VDOC-000095.

On May 8, 2021, a nurse noted Jackson presented to sick call complaining about the boots he was required to wear for his new job in the tailor shop. FR-SDT-VDOC-000140. Jackson requested a doctor's order for "tennis shoes or modified work boots." *Id.* The nurse referred Jackson to Dr. Smith for a medical assessment. *Id.*

Dr. Ward, the neurosurgeon, physically examined Jackson on May 12, 2021. FR-SDT-VDOC-000091. Dr. Ward noted Jackson had "totally normal muscle function of his right lower extremity." FR-SDT-VDOC-000092. Although Jackson exhibited numbness in his heel, the involved muscles were "all within normal limits." *Id.* Based on the physical examination findings, Dr. Ward provided the following assessment: "In the absence of any weakness of his right foot there is no point in exploring his nerve. We will get orthopedics to look at his MRI to see whether not . . . the Baker cyst in the back of his leg might be addressed." *Id.* Otherwise, Dr. Ward noted there was "no follow-up needed." FR-SDT-VDOC-000093.

Dr. Smith saw Jackson again on June 3, 2021, regarding his request for a "shoe pass." FR-SDT-VDOC-000134. Prior to the visit, Dr. Smith "reviewed the visit note and documentation by Dr. Ward and noted that the neurosurgeon had evaluated him and found normal strength and muscle function and did not recommend surgery." Smith Decl. ¶ 16 (citing SDT-VDOC-000134). During the visit with Dr. Smith, Jackson's gait was normal, and he was not in acute distress. *Id.* They discussed Jackson's shoe request, and Dr. Smith informed Jackson "there was no medical reason why he could not wear boots to his job, which would offer more protection than a tennis

shoe." *Id.* Dr. Smith noted Jackson became angry and threatened to file a lawsuit against him. *Id.* (citing FR-SDT-VDOC-000134). Based on Dr. Ward's most recent report, Dr. Smith placed a referral for an orthopedic consult. *Id.*

Jackson was examined by Dr. Madana Mohana Vallem at VCU Orthopedics on July 12, 2021. FR-SDT-VDOC-000088. X-rays obtained that day revealed "no acute findings." *Id.* Dr. Vallem noted Jackson exhibited "tenderness along the Achilles tendon in the right foot" and "generalized numbness in the right foot," but Jackson's strength appeared to be "normal bilaterally in both feet with normal strength in dorsiflexion, plantar flexion, inversion and eversion with intact distal pulses." *Id.* Dr. Vallem diagnosed Jackson with "[r]ight foot insertional calcific Achilles tendinopathy." *Id.* He recommended Jackson wear arch supports and noted he "showed [Jackson] how to perform stretching exercises for the Achilles tendinopathy." *Id.* Dr. Vallem also recommended Jackson "continue symptomatic treatment with NSAIDs as needed" and "continue activity as tolerated." *Id.* At the conclusion of his report, Dr. Vallem noted "[n]o further acute orthopedic intervention [was] necessary" at that time and Jackson "understood the treatment plan." FR-SDT-VDOC-000089.

Dr. Smith saw Jackson again on July 27, 2021, and reviewed the orthopedic specialist's recommendations with him. Smith Decl. ¶ 19 (citing FR-SDT-VDOC-000131). Dr. Smith renewed Jackson's prescriptions for ibuprofen and Cymbalta. *Id.* He also ordered arch supports as recommended by the orthopedic specialist. Smith Decl. ¶ 18. Nurse V. Hall issued the arch supports to Jackson on August 19, 2021. FR-SDT-VDOC-0000131.

Dr. Smith's declaration indicates he "continued to see [Jackson] as needed for general medical issues through the year 2021 and into 2022." Smith Decl. ¶ 21. A November 3, 2021, notation in Jackson's medical chart indicates Jackson's prescription for Cymbalta was not renewed

7

due to poor compliance and Jackson could obtain ibuprofen through the commissary. FR-SDT-VDOC-000131; *see also* Dameron Decl. ¶ 10 (noting that "ibuprofen, which is the medication that was recommended by the orthopedic specialist, is always available to inmates at the commissary" and that no prescription is required).

On June 19, 2022, Dr. Smith renewed Jackson's medical order for a bottom bunk assignment. FR-SDT-VDOC-000014. Dr. Smith left Augusta in May 2023. Smith Decl. ¶ 23.

As of November 9, 2023, Jackson's bottom bunk status was discontinued. FR-SDT-VDOC-000111. On November 14, 2023, Nurse V. Hall scheduled Jackson to see a doctor regarding his bunk assignment, and a doctor met with Jackson that same day. *Id.* The doctor noted Jackson was able to function normally, he ambulated well, and he did not meet the requirements for a bottom bunk. Dameron Decl. ¶ 19 (citing FR-SDT-VDOC-000111). "The provider also noted that neurosurgery and orthopedics had signed off on further care." *Id.* Nurse Dameron's declaration indicates she played no role in the decision to discontinue Jackson's bottom bunk pass. *Id.* ¶¶ 18–19.

C.    **Jackson's Response in Opposition**

On November 1, 2024, Jackson filed a verified response in opposition to the defendants' motion for summary judgment. In response to the defendants' statement of facts, Jackson asserts he was prescribed an ankle sleeve by a healthcare provider at another correctional institution and Dr. Smith failed to address his request for the sleeve to be reissued after he arrived at Augusta. *See* Pl.'s Resp. Mot. Summ. J. 3–4, ECF No. 65. Jackson also asserts he "had no choice but to resign" from his prison job after Dr. Smith denied his request for a tennis shoe pass. *Id.* at 5.

Jackson contends the orthopedic specialist, Dr. Vallem, informed him that the specialist was "ordering physical therapy exercises to be performed" and Jackson interpreted the specialist's

8

statement to mean he would receive physical therapy at Augusta. *Id.* When Dr. Smith subsequently asked Jackson if the specialist explained the physical therapy exercises to him, Jackson admittedly responded in the affirmative. *See id.* at 6 ("I told him that, yes, [the specialist] had told me about the need for them.") Jackson asserts, however, he had "a different understanding of this prescribed treatment" and he was under the impression the exercises would be performed with a physical therapist rather than on his own. *Id.* Jackson further asserts he submitted requests for physical therapy in August and September 2021, all of which went unanswered. *Id.*

Jackson maintains Dr. Smith did not examine him again after the follow-up appointment on July 27, 2021. *Id.* at 6. Jackson asserts he "was not seen again until a new provider took over in 2023." *Id.*

Jackson acknowledges his prescription for Cymbalta was discontinued due to poor compliance. *Id.* at 7. When he submitted written requests to have his prescriptions renewed, Nurse Dameron informed him he could purchase over-the-counter pain medication from the commissary. *Id.* Although Nurse Dameron denies making the comment, *see* Dameron Decl. ¶¶ 11–12, Jackson continues to assert she told him to "just purchase suboxone off the yard like everyone else" when he complained of being unable to afford to buy over-the-counter medication. Pl.'s Resp. Mot. Summ. J. 8 (internal quotation marks omitted).

With respect to the discontinuation of his bottom bunk status in November 2023, Jackson does not dispute Nurse Dameron's sworn assertion that she played no role in the decision. *See id.* at 6 (responding to paragraphs 26–30 of the defendants' statement of facts with "no dispute").

By Order entered November 15, 2024, Jackson was given 21 days to file any additional evidence or argument in response to the defendants' motion for summary judgment. Order 3, ECF

9

No. 66. The 21-day period has expired, and no additional evidence or argument has been presented for consideration.

## II.   STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, a court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Henry v. Purnell*, 652 F.3d 524, 548 (4th Cir. 2011)).

When ruling on a motion for summary judgment, the court must "view the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party." *Id.* at 312. "To defeat a properly filed motion for summary judgment, the nonmoving party must set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Muchira v. Al-Rawaf*, 850 F.3d 605, 616 (4th Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). "Conclusory allegations and speculation will not suffice." *Id.* Instead, "there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson*, 477 U.S. at 252.

## III.   DISCUSSION

Jackson claims Dr. Smith and Nurse Dameron acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment to the United States Constitution. "The Eighth Amendment, which is applicable to the States through the Fourteenth Amendment, prohibits the infliction of 'cruel and unusual punishments.'" *Anderson v. Kingsley*, 877 F.3d 539,

543 (4th Cir. 2017) (quoting U.S. Const. amend. VIII). "Under the Eighth Amendment, prisoners have the right to receive adequate medical care while incarcerated." *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018) (citing *Scinto v. Stansberry*, 841 F.3d 219, 236 (4th Cir. 2016)). An Eighth Amendment violation occurs when a prison official "demonstrates 'deliberate indifference' to an inmate's serious medical needs." *Id.*

"A deliberate indifference claim has two components, objective and subjective." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). The plaintiff must show he had serious medical needs (the objective component) and a defendant acted with deliberate indifference to those needs (the subjective component). *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021). A medical need is sufficiently serious for purposes of the objective component "when it has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019) (internal quotation marks omitted).

"The subjective component requires showing that the defendant had actual subjective knowledge of both the plaintiff's serious medical condition and the excessive risk posed by the official's action or inaction." *Phoenix v. Amonette*, 95 F.4th 852, 859 (4th Cir. 2024) (internal quotation marks and brackets omitted). In other words, "[a]n official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively 'knows of and disregards an excessive risk to inmate health or safety.'" *Jackson*, 775 F.3d at 178 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "That is a higher standard for culpability than mere negligence or even civil recklessness, and as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id*. To establish an Eighth Amendment violation, "it is not enough that an official *should* have known of a risk; he or she

11

must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.*

Additionally, the United States Court of Appeals for the Fourth Circuit "consistently" has found that mere disagreements between an inmate and a medical provider over the inmate's proper medical care "fall short of showing deliberate indifference." *Id.*; *see also Phoenix*, 95 F.4th at 859 (noting that such disagreements "do not cut it"). Likewise, "in the Eighth Amendment context, questions of medical judgment are generally 'not subject to judicial review.'" *Griffin v. Mortier*, 837 F. App'x 166, 171 (4th Cir. 2020) (quoting *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975)). To find a medical provider liable, "the treatment given must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Hixson*, 1 F.4th at 303.

Applying these standards, and after reviewing the record in light most favorable to Jackson, I conclude that Dr. Smith and Nurse Dameron are entitled to summary judgment. I will address each defendant in turn.

**A.    Dr. Smith**

The medical records establish Dr. Smith personally examined Jackson on several occasions after Jackson arrived at Augusta and Dr. Smith actively took steps to address Jackson's complaints of pain and numbness in his right foot and leg. As indicated above, Dr. Smith arranged for Jackson to be evaluated by a neurosurgeon and an orthopedic specialist; he ordered Jackson be assigned to a bottom bunk; he ordered arch supports as recommended by the orthopedic specialist; and he prescribed an anti-inflammatory medication (ibuprofen) as recommended by the orthopedic specialist. *See* FR-SDT-VDOC-000088 (recommending that Jackson wear arch supports and "continue symptomatic treatment with NSAIDs as needed"). On this record, no reasonable juror

could find that Dr. Smith provided medical treatment that was so grossly inadequate or incompetent as to shock the conscience. Although Jackson asserts that Dr. Smith never examined him again after a July 2021 follow-up appointment, there is no evidence that Jackson's condition worsened to the point that another examination was medically warranted, or that Dr. Smith was made aware of any worsening pain or numbness. To the extent Jackson disagrees with any of the treatment decisions made by Dr. Smith, "such disagreements . . . fall short of showing deliberate indifference." *Jackson*, 775 F.3d at 178.

For similar reasons, Jackson has failed to establish Dr. Smith exhibited deliberate indifference by declining to issue him an ankle sleeve. Dr. Smith's declaration explains he chose to consult with and obtain recommendations from a neurosurgeon and an orthopedist after Jackson arrived at Augusta, *see* Smith Decl. ¶ 24, and it is undisputed that neither specialist recommended Jackson wear an ankle sleeve or brace. Even if another prison doctor determined an ankle sleeve was necessary or appropriate, "a disagreement among reasonable medical professionals is not sufficient to sustain a deliberate indifference claim." *Hixson*, 1 F.4th at 303; *see also Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation.").

The record is also devoid of evidence from which a reasonable juror could find that Dr. Smith "disregarded an excessive risk [to Jackson's] health or safety" by declining to issue a tennis shoe pass for work. *Hixson*, 1 F.4th at 302. The record reflects Dr. Smith determined there was "no medical reason" why Jackson could not wear boots to work, which he believed would provide "more protection than a tennis shoe," and Dr. Smith based this determination on his own physical examination findings and those made by the neurosurgeon a few weeks earlier. *See* Smith Decl.

13


¶¶ 16, 26; FR-SDT-VDOC-000134. As the Fourth Circuit has explained, "[the] deliberate indifference standard is not satisfied by a showing of mere negligence, a mere error of judgment . . . , or mere disagreement concerning questions of medical judgment." *Germain v. Shearin*, 531 F. App'x 392, 395 (4th Cir. 2013). Thus, "where the evidence shows that a decision was based on medical judgment, a jury may not find deliberate indifference, even if other professionals would have handled the decision differently." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021); *see also Jackson*, 775 F.3d at 178–79 ("Though hindsight suggests that Lightsey's treatment decisions may have been mistaken, even gravely so, we agree with the district court that Jackson's claim against Lightsey is essentially a disagreement between an inmate and a physician over the inmate's proper medical care, and we consistently have found such disagreements to fall short of showing deliberate indifference.") (internal quotation marks and brackets omitted).

Finally, Jackson has no viable claim for deliberate indifference against Dr. Smith based on the alleged failure to order physical therapy prescribed by a specialist. Although "[a] refusal to follow a specialist's order can reflect deliberate indifference," *Bilik v. Shearing*, 860 F. App'x 435, 439 (7th Cir. 2021), it is undisputed that none of the specialists' reports actually contained a prescription or recommendation for physical therapy. *See id.* (noting, in affirming summary judgment, that an inmate did not proffer evidence that the specialist who examined him had ordered physical therapy). Instead, the orthopedist's report indicates that he "showed [Jackson] how to perform stretching exercises" and instructed Jackson's facility "to provide arch support[s] and continue activity as tolerated." FR-SDT-VDOC-000088. Thus, while Jackson's own interactions with the orthopedist may have led him to believe that he would be receiving physical therapy at Augusta, there is no evidence from which a reasonable juror could find that Dr. Smith knowingly disregarded the treatment recommendations made by either specialist. Jackson's personal belief

14

that physical therapy would be provided is insufficient to establish Dr. Smith acted with deliberate indifference.

For these reasons, I conclude Dr. Smith is entitled to summary judgment on the Eighth Amendment claims asserted against him.

**B.      Nurse Dameron**

Jackson has also failed to put forth sufficient evidence to survive summary judgment on his Eighth Amendment claims against Nurse Dameron, who served in an administrative capacity during the time period at issue. To the extent Jackson faults Nurse Dameron for failing to respond to his requests for physical therapy in August and September 2021, he has pointed to no evidence that would allow a reasonable juror to find Nurse Dameron actually knew of and disregarded an excessive risk to his health or safety. Jackson was examined by an orthopedist in July 2021, and the specialist's written treatment plan included no referral or recommendation for physical therapy. Instead, the specialist recommended Jackson perform stretching exercises on his own. Courts have recognized that "administrative officials . . . are entitled to rely on medical judgments made by medical professionals responsible for prisoner care," *Brennan v. Headley*, 807 F. App'x 927, 938 (11th Cir. 2020) (internal quotation marks omitted), and that "nurses may generally defer to instructions given by physicians," *Holloway v. Del. Cnty. Sheriff*, 700 F.3d 1063, 1075 (7th Cir. 2012). Although "that deference may not be blind or unthinking, particularly if it is apparent that [a] physician's order will likely harm the patient," there is no evidence from which a reasonable juror could find that Nurse Dameron knew that deferring to the orthopedic specialist or any other examining physician posed an excessive risk to Jackson's health or safety.

There is also no evidence that Nurse Dameron played any role in discontinuing Jackson's medication prescriptions in November 2021. A treatment note reflects the prescription for

Cymbalta was discontinued for poor compliance and that ibuprofen—the only type of medication recommended by the orthopedic specialist— was available for inmates to purchase in the prison commissary without a prescription. It is "well established" that "the Eighth Amendment does not compel prison administrators to provide cost-free medical services to inmates who are able to contribute to the cost of their care." *Poole v. Isaacs*, 703 F.3d 1024, 1026 (7th Cir. 2012); *see also Hoffer v. Fla. Dep't of Corr.*, 973 F.3d 1263, 1276 (11th Cir. 2020) ("It is surely uncontroversial that 'the deliberate difference standard . . . does not guarantee prisoners the right to be entirely free from the cost considerations that figure in the medical-care decisions made by most non-prisoners in our society.'") (quoting *Reynolds v. Wagner*, 128 F.3d 166, 175 (3d Cir. 1997)). Although Jackson asserts he told Nurse Dameron he could not afford to regularly purchase over-the-counter medication from the commissary, he has not submitted any evidence indicating he actually lacked the funds necessary to purchase ibuprofen as needed for pain relief. Without such evidence, no reasonable juror could find that Nurse Dameron violated the Eighth Amendment by failing to help him obtain prescription pain medication. *See, e.g.*, *Franklin v. Shah*, No. 3:17-cv-00960, 2020 WL 980238, 2020 U.S. Dist. LEXIS 34253, at *16–17 (S.D. Ill. Feb. 28, 2020) (concluding that an inmate's conclusory assertion that he was unable to afford pain medication, which was unsupported by any evidence, was insufficient to avoid summary judgment on a claim of deliberate indifference asserted against a doctor who stopped prescribing pain medication and told the inmate to purchase it from the commissary); *Taylor v. Corizon Med. Servs.*, No. 1:11-cv-01436, 2013 WL 4678670, 2013 U.S. Dist. LEXIS 124411, at *12–15 (S.D. Ind. Aug. 30, 2013) (concluding that prison medical staff did not violate an inmate's Eighth Amendment rights by refusing to prescribe a fiber supplement since there was no evidence to support the inmate's contention that he could not afford to purchase the fiber supplement available in the commissary).

In reaching this decision, I do not condone the "snide remark" that Nurse Dameron purportedly made suggesting that Jackson "just purchase suboxone off the yard like everyone else." Pl.'s Resp. Mot. Summ. J. 8 (internal quotation marks omitted). While this alleged comment, which Nurse Dameron denies making, is completely inappropriate, it is not alone sufficient to give rise to an Eighth Amendment claim. *See Hollyfield v. Hurst*, 796 F. App'x 817, 820 (5th Cir. 2019) ("Rude or insensitive behavior towards prisoners is disgraceful conduct, but it does not alone rise to the level of deliberate indifference."); *Bismark v. Fisher*, 213 F. App'x 892, 897 (11th Cir. 2007) ("[I]t is not a violation of the Eighth Amendment for a prison physician to consult with a prisoner concerning a medical condition in an aloof or unfriendly way. Much more is required."); *Atkins v. Lofton*, 373 F. App'x 472, 473 n.1 (5th Cir. 2010) ("We do not suggest that we condone any rude or insensitive treatment Atkins may have received. However, rudeness or lack of compassion alone are insufficient to support a cause of action [under § 1983]."); *Beard v. Gusman*, No. 2:13-cv-06633, 2015 WL 422999, 2015 U.S. Dist. LEXIS 12065, at *7 (E.D. La. Feb. 2, 2015) ("Although [the medical staff's] comments were clearly insensitive, being callous or rude in the context of medical care does not an Eighth Amendment violation make.") (internal quotation marks omitted).

Finally, to the extent Jackson sought to hold Nurse Dameron responsible for the discontinuation of his bottom bunk pass in October or November 2023, it is now undisputed that Nurse Dameron was not personally involved in that decision. Accordingly, she cannot be held liable under § 1983 for the change to Jackson's bunk assignment. *See Younger v. Crowder*, 79 F.4th 373, 381 (4th Cir. 2023) ("As the Supreme Court has explained, '[i]n a § 1983 suit . . . each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.'") (alterations in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)).

## IV. CONCLUSION

For the reasons stated, the court concludes Dr. Smith and Nurse Dameron are entitled to summary judgment on Jackson's Eighth Amendment claims of deliberate indifference. Accordingly, the defendants' motion for summary judgment, ECF No. 55, is **GRANTED**. An appropriate Order will be entered.

Entered: March 20, 2025

*C. Kailani Memmer*

C. Kailani Memmer
United States Magistrate Judge